THE STATE EX REL. CLEVELAND RIGHT TO LIFE ET AL. *v.* THE STATE OF

OHIO CONTROLLING BOARD ET AL.

**[Cite as *State ex rel. Cleveland Right to Life v. State of Ohio Controlling Bd.,***

**138 Ohio St.3d 57, 2013-Ohio-5632.]**

*Legislative process—Appropriations—Veto—Controlling Board's authority—*
*R.C. 127.17—Medicaid—R.C. 5163.03.*

(No. 2013-1668—Submitted December 11, 2013—Decided December 20, 2013.)

IN MANDAMUS AND PROHIBITION.

_____

**O'CONNOR, C.J.**

**{¶ 1}** This case came on for consideration upon relators' request for writs of mandamus and prohibition. Relators have abandoned their request for prohibition, as they fail to argue it on the merits in their briefs. We therefore concentrate our efforts on the prayer for a writ of mandamus.

**{¶ 2}** To be entitled to a writ of mandamus, the relators must establish (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of the relevant agency or governmental unit to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Waters v. Spaeth*, 131 Ohio St.3d 55, 2012-Ohio-69, 960 N.E.2d 452, ¶ 6. Relators must prove that they are entitled to the writ by clear and convincing evidence. *Id.* at ¶ 13.

**{¶ 3}** The relators fail in their quest because they have not adequately shown that the Controlling Board had a clear legal duty to follow the directives of the legislature when those directives are not expressed in the final, enrolled bill.

**{¶ 4}** Although this case arises in the context of a complex social and political debate, our task is limited. Quite simply, a single question of law is presented to us: Did the Ohio Controlling Board violate R.C. 127.17 by

approving the Ohio Department of Medicaid's request for increased appropriation authority for the Hospital Care Assurance Match Fund? For the reasons that follow, we must answer that question in the negative. Therefore, we deny relators' request for a writ of mandamus.

## RELEVANT BACKGROUND

{¶ 5} Congress created Medicaid in 1965 as a program to provide federal funds to states that pay for medical treatment for the poor. 42 U.S.C. 1396 et seq. State participation is voluntary, but once a state chooses to participate, it must administer a plan in a manner that meets federal requirements. *Frew v. Hawkins*, 540 U.S. 431, 433, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).

{¶ 6} To receive federal funds, states must prepare a plan that defines the categories of individuals eligible for benefits and the specific kinds of medical services the plan will cover. 42 U.S.C. 1396a(a)(1) and (17). A state plan must comply with federal criteria regarding covered services, eligible populations, and costs, 42 U.S.C. 1396a, and the plan must be approved by the secretary of health and human services. 42 U.S.C. 1396a(b).

{¶ 7} If the secretary determines that a state has changed or administered its approved plan in such a way that it no longer complies with federal requirements, the secretary may reduce or eliminate federal payments to the noncomplying state. 42 U.S.C. 1396c.

{¶ 8} The federal Medicaid statutes require participating states to provide medical coverage for certain populations. 42 U.S.C. 1396(a)(10). As originally enacted, mandatory coverage applied to individuals who received cash assistance under one of four programs: Old Age Assistance, 42 U.S.C. 301 et seq.; Aid to Families with Dependent Children, 42 U.S.C. 601 et seq.; Aid to the Blind, 42 U.S.C. 1201 et seq.; and Aid to the Permanently and Totally Disabled, 42 U.S.C. 1351 et seq. *Id.*; *see also Schweiker v. Gray Panthers*, 453 U.S. 34, 37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981).

**{¶ 9}** Over time, Congress has amended the Medicaid program on multiple occasions to expand the scope of those to whom mandatory coverage must apply. The term used for this concept is "mandatory eligibility." For example, between 1988 and 1990, Congress required states to include as program beneficiaries pregnant women with family incomes up to 133 percent of the federal poverty line, children up to age 6 at the same income levels, and children ages 6 to 18 with family incomes up to 100 percent of the federal poverty line. 42 U.S.C. 1396a(a)(10)(A)(i) and 1396a(l).

**{¶ 10}** States may also provide optional coverage for the "medically needy," meaning persons whose income exceeds financial eligibility criteria for those programs, and hence for Medicaid, but who otherwise satisfy the criteria for one or more of those assistance programs. 42 U.S.C. 1396a(a)(10)(C); *Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 651, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003). If states choose to cover an optional eligibility group, the federal government subsidizes a significant portion of the cost.

**{¶ 11}** Ohio is a Medicaid participant. The Ohio Department of Medicaid acts as the single state agency to supervise and administer the Medicaid program. R.C. 5162.03 (formerly R.C. 5111.01). Ohio's Medicaid statutes preserve the dichotomy between "mandatory services" and "optional services." R.C. 5164.01(I) and (N).

**{¶ 12}** In 2010, Congress enacted the Patient Protection and Affordable Care Act ("PPACA"), Pub.L. No. 111-148, 124 Stat. 119 (2010). Among its many provisions, the PPACA created a new category of mandatory beneficiaries, called Group VIII, consisting of all individuals under the age of 65 with incomes below 133 percent of the federal poverty line. 42 U.S.C. 1396a(a)(10)(A)(i)(VIII). In addition, the PPACA changed the essential health-benefits package that states must provide to all Medicaid recipients. 42 U.S.C. 1396a(k)(1); 1396u-7(b)(5); 18022(B).

**{¶ 13}** The PPACA guaranteed that the federal government would pay 100 percent of the costs for covering the newly eligible Group VIII individuals for three years, through 2016. 42 U.S.C. 1396d(y)(1)(A). Thereafter, the federal contribution would gradually decrease to a permanent minimum of 90 percent in 2020. 42 U.S.C. 1396d(y)(1)(B) through (E).

**{¶ 14}** On June 28, 2012, the United States Supreme Court announced its decision in *Natl. Fedn. of Indep. Business v. Sebelius*, ___ U.S. ___, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). The petitioners claimed that the PPACA was unconstitutional in two respects.

**{¶ 15}** First, the petitioners challenged the individual mandate, which requires all Americans to maintain minimum essential health insurance or else pay a "shared responsibility payment" to the federal government. 26 U.S.C. 5000A. The Supreme Court rejected that argument and upheld the individual mandate as a legitimate exercise of Congress's constitutional authority to lay and collect taxes. *Id.* at 2593-2600.

**{¶ 16}** Second, the petitioners argued that Congress lacked the authority to increase the scope of Medicaid coverage or to compel participating states to comply with the expansion. The court disagreed and upheld the ability of Congress to expand the availability of health care. *Id.* at 2607. However, the court declared that 42 U.S.C. 1396c, the provision that authorizes the secretary to reduce or eliminate federal subsidies to participating states for noncompliance with federal mandates, was unconstitutional if used to compel states to extend Medicaid coverage to Group VIII. *Id.* Essentially, the Supreme Court made coverage of Group VIII optional rather than mandatory.

**{¶ 17}** On June 27, 2013, one year after *Sebelius* was released, the General Assembly passed Am.Sub.H.B. No. 59, the omnibus budget bill. Am.Sub.H.B. No. 59 added two relevant provisions to the Revised Code, R.C. 5163.03 and 5163.04.

**{¶ 18}** R.C. 5163.03 provided:

> (A) Subject to sections 5163.04 and 5163.05 of the Revised Code, the medicaid program shall cover all mandatory eligibility groups.
>
> (B) The medicaid program shall cover all of the optional eligibility groups that state statutes require the medicaid program to cover.
>
> (C) The medicaid program may cover any of the optional eligibility groups to which either of the following applies:
>
> (1) State statutes expressly permit the medicaid program to cover the optional eligibility group.
>
> (2) State statutes do not address whether the medicaid program may cover the optional eligibility group.
>
> (D) The medicaid program shall not cover any eligibility group that state statutes prohibit the medicaid program from covering.

**{¶ 19}** R.C. 5163.04. as passed by the General Assembly stated:

> The medicaid program shall not cover the group described in the "Social Security Act," section 1902(a)(10)(A)(i)(VIII), 42 U.S.C. 1396a(a)(10)(A)(i)(VIII).

Thus, by passing R.C. 5163.04, the General Assembly refused to provide coverage for Group VIII, which, by virtue of *Natl. Fedn. of Indep. Business*, was entitled to optional coverage.

{¶ 20} On June 30, 2013, Governor John Kasich signed Am.Sub.H.B. No. 59, but only after exercising his line-item veto authority to strike certain provisions. Most notably, the governor vetoed R.C. 5163.04, the prohibition on Medicaid coverage for Group VIII.

{¶ 21} Thus, after the governor's veto, the statute, as enrolled, gave the state Medicaid program authority to cover any federal optional eligibility group that is not addressed by state law. R.C. 5163.03(C)(2). And the law, as enrolled, no longer expressly prohibited optional coverage for Group VIII.

{¶ 22} On September 26, 2013, the state Medicaid director filed a proposed plan amendment with the Centers for Medicare and Medicaid Services ("CMS"), the federal agency overseeing Medicaid, to modify Ohio's plan to provide services to Group VIII. The state Medicaid director applied for the modification in reliance on the authority conferred by R.C. 5162.07(B), which permits the Medicaid director to seek federal approval for amendments to the state Medicaid plan. CMS approved the amendment on October 10, 2013.

{¶ 23} On October 11, 2013, the Ohio Department of Medicaid submitted an application to the Controlling Board for an increase in its appropriation authority from the accounts holding federal Medicaid funds. Specifically, the director asked the Controlling Board to increase its appropriation authority in fund 3F00[1] for fiscal year 2014 by $561,700,000 and by $1,999,500,000 in fiscal year 2015. The request made clear that every dollar of increased spending would come from the federal government, and not a single dollar of state money would be expended.

---

1. "Fund 3F00" refers to a fund created by R.C. 5168.11(B) (formerly R.C. 5112.18) to hold federal matching funds received as a result of certain department health-care expenditures. The Ohio Administrative Code refers to this fund as the "Hospital Care Assurance Match Act." Ohio Adm.Code 5160-2-08(A)(5).

{¶ 24} The Controlling Board approved the department's request on October 21, 2013.

{¶ 25} Relators filed the present request for writs of mandamus and prohibition on October 22, 2013.

## ANALYSIS

{¶ 26} A state agency can receive permission to spend federal dollars in one of three ways: a specific appropriation by the General Assembly, by executive order of the governor pursuant to R.C. 107.17 (which is inapplicable because the governor never issued an executive order), or by way of a request to, and approval from, the Controlling Board. R.C. 131.35(A)(1).

{¶ 27} As noted above, Ohio has authorized participation in the federal Medicaid plan. The federal funds at issue here constitute excess money over and above the amounts appropriated by the General Assembly. And the Revised Code expressly permits expenditure of excess federal funds when authorized by the Controlling Board. R.C. 131.35(A)(2).

{¶ 28} Relators dispute the applicability of R.C. 131.35(A)(2) because they do not consider this a modification of the preexisting Medicaid program. Rather, they view the extension of Medicaid services to Group VIII as the implementation of an entirely new health-care law. However, characterizing the PPACA as a component of a new national health-care plan will not result in authorization of the writs sought by the relators.

{¶ 29} Even if the PPACA is an entirely new federal program, the Revised Code provides an alternative source of authority for the Controlling Board's actions. "Controlling board authorization for a state agency to make an expenditure of federal funds constitutes authority for the agency to participate in the federal program providing the funds." R.C. 131.35(A)(5). Therefore, even if the PPACA constitutes a new federal program, the department of Medicaid could

still participate, and expend federal funds, as long as it receives authorization from the Controlling Board. Here, it received that authorization.

{¶ 30} This leads to the central question in relators' complaint: whether the Controlling Board exceeded its statutory authority when it authorized participation in the program because it acted contrary to the intentions of the General Assembly.

{¶ 31} The limitations on the authority of the Controlling Board can be found in R.C. 127.17: "The controlling board shall take no action which does not carry out the legislative intent of the general assembly regarding program goals and levels of support of state agencies as expressed in the prevailing appropriation acts of the general assembly."

{¶ 32} Relators argue that the General Assembly expressed its intention not to extend medical services to Group VIII members in the plain language of R.C. 5163.04. According to relators, the "legislative intent of the general assembly" can be found only in the appropriation act as passed by the legislature, irrespective of the governor's later line-item veto. Thus, relators conclude, by granting an appropriation authorization increase, the effect of which is to provide medical services to Group VIII members, the Controlling Board violated R.C. 127.17.

{¶ 33} The argument is not well taken.

{¶ 34} R.C. 127.17 indicates that the legislature's intention is to be found in the "*prevailing* appropriation acts of the general assembly." (Emphasis added.) *Black's Law Dictionary* 1188 (6th Ed.1990) defines "prevail" as "[t]o become effective or effectual, to be in force, to obtain, to be in general use or practice, to be commonly accepted or adopted." The "prevailing" appropriations act is therefore the one that has become effective or in force. Under our Constitution, an act is not effective and in force, that is, it does not become law, until it is signed into law, or permitted to become law, by the governor. Ohio Constitution,

8

Article II, Section 16; *see also Patterson Foundry & Machine Co. v. Ohio River Power Co.*, 99 Ohio St. 429, 434-435, 124 N.E. 241 (1919).

{¶ 35} Any other conclusion would create a constitutional crisis.

{¶ 36} The Ohio Constitution expressly confers upon the governor authority to excise any item or items in an appropriation bill, and such disapproved items "shall be void." Ohio Constitution, Article II, Section 16. But R.C. 127.17, as construed by relators, would operate as a statutory negation of the governor's constitutional powers. The General Assembly would have the power to command the Controlling Board, in all cases, to disregard the governor's veto in the implementation of appropriations. This interpretation is clearly contrary to the checks and balances that are critical to our constitutional democracy.

{¶ 37} Finally we note that the Ohio Constitution provides the mechanism by which the General Assembly may override a veto: repass the legislation by a vote of three-fifths of the members of both houses. Constitution, Article II, Section 16. The legislature cannot circumvent this constitutional option by obtaining a writ from this court that forbids the Controlling Board to comply with the law, as that law is modified by the governor's veto. *State ex rel. Pub. Util. Comm. v. Controlling Bd.*, 130 Ohio St. 127, 132, 197 N.E. 129 (1935).

{¶ 38} We therefore reject relators' prayer because the relators have not established a legal basis for the issuance of an extraordinary writ. More specifically, the relators fail to establish a clear legal right to the requested relief and a clear legal duty on the part of the Controlling Board to undo the authorization of the expenditure of additional federal funds to provide medical insurance for Group VIII members.

Writs denied.

PFEIFER and O'NEILL, JJ., concur.

LANZINGER, J., concurs in judgment only.

O'DONNELL, J., dissents.

9

KENNEDY and FRENCH, JJ., dissent and would dismiss.

_____

**O'DONNELL, J., dissenting.**

{¶ 39} Respectfully, I dissent.

{¶ 40} The case does not present an issue of constitutional magnitude for interpretation but rather raises a political question for resolution by the political branches of government. As the lead opinion articulates, the question is "Did the Ohio Controlling Board violate R.C. 127.17?" Lead opinion at ¶ 4.

{¶ 41} R.C. 127.17 provides, "The controlling board shall take no action which does not carry out the legislative intent of the general assembly regarding program goals and levels of support of state agencies as expressed in the prevailing appropriation acts of the general assembly." In my view, the court ought not to stray into the tangled policy questions at issue here, but rather, should dismiss the complaint.

{¶ 42} The role of the judiciary is to decide legal questions. This case, however, involves a political question concerning whether a legislative agency has acted contrary to policy goals of the General Assembly. "The nonjusticiability of a political question is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which excludes from judicial review the providence of policy choices and value judgments made by the political branches of government. It operates "to restrain the Judiciary from inappropriate interference in the business of the other branches of Government." *United States v. Munoz-Flores*, 495 U.S. 385, 394, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990).

{¶ 43} Thus, as we explained in *State ex rel. Grendell v. Davidson*, 86 Ohio St.3d 629, 633, 716 N.E.2d 704 (1999), "A writ of mandamus will not issue to a legislative body or its officers to require the performance of duties that are purely legislative in character and over which such legislative bodies have

10

exclusive control." Citing *Wapakoneta v. Helpling*, 135 Ohio St. 98, 108, 19 N.E.2d 772 (1939). "The constitutional principle of separation of powers protects the General Assembly from such infringement." *Id.*, citing *State v. Hochhausler*, 76 Ohio St.3d 455, 463, 668 N.E.2d 457 (1996).

**{¶ 44}** This court's intervention is sought in a conflict that exists solely within the legislative branch, asking us to supervise its internal functioning and decision making and implicating the power of the General Assembly to oversee its own affairs in regulating a legislative arm of its own creation. These matters are not the subject of judicial cognizance.

**{¶ 45}** The General Assembly established the Controlling Board solely as a convenience, delegating to it authority to make the myriad adjustments to appropriations needed on a periodic basis. *State ex rel. Ohio Funds Mgt. Bd. v. Walker*, 55 Ohio St.3d 1, 2, 561 N.E.2d 927 (1990). But having created the Controlling Board, the legislature can abolish it, or regulate its decision making, or override its decisions by legislative action. As Justice Holmes explained in his separate opinion in *State ex rel. Meshel v. Keip*, 66 Ohio St.2d 379, 391, 423 N.E.2d 60 (1981) (Holmes, J., concurring in part and dissenting in part), "Clearly, if the General Assembly disapproved of the Controlling Board's action, it could order the board to replace the funds in the account. The General Assembly has unlimited right to terminate, recall, or abridge the delegated power of the Controlling Board if it so desires." Or, as Justice Paul Brown put it in his dissent in *Meshel*, "The General Assembly, as a body, clearly is empowered to reverse any decision of the Controlling Board. Thus, the instant case represents an unjustifiable attempt to circumvent the legislative process." *Id.* at 396 (Brown, J., dissenting), citing *Outagamie Cty. v. Smith*, 38 Wis.2d 24, 37, 155 N.W.2d 639 (1968).

**{¶ 46}** Because it is a creature of statute, the Controlling Board is wholly accountable to the legislative branch of government. The Controlling Board is

comprised of seven individuals: the director of budget and management or the director's designate; the chair or vice-chair of the House Finance-Appropriations Committee, designated by the Speaker; the chair or vice-chair of the Senate Finance-Appropriations Committee, designated by the president; one member of the House each from the majority and the minority parties, designated by the Speaker; and one member of the Senate each from the majority and minority parties, designated by the president. R.C. 127.12. Thus, six members of the Controlling Board are directly answerable to the General Assembly, appointed by leadership in the House and the Senate.

{¶ 47} The facts as presented to our court reveal that Governor Kasich proposed to amend the state Medicaid plan to extend coverage to Group VIII individuals, but the General Assembly did not agree and interlineated "shall not" into that line item in the budget bill. The governor, exercising his constitutional prerogative to veto items in appropriations legislation, modified H.B. 59 to authorize coverage of Group VIII, changing the legislature's "shall not" to "may." Because the General Assembly did not override the governor's veto, H.B. 59, as modified by the governor, became law.

{¶ 48} Notably, after the Medicaid director sought authorization from the Controlling Board for the expenditure of federal funds to expand Medicaid, but before the vote of the Controlling Board, two members of the board were replaced. As the Columbus *Dispatch* reported, "To help ensure the request got the needed votes, [Speaker] Batchelder replaced Rep. Cliff Rosenberger of Clarksville this morning with McGregor, a moderate, term-limited Republican who had said he would vote for the measure." (http://www.dispatch.com /content/stories/local/2013/10/21/Medicaid-expansion-vote.html).

{¶ 49} The General Assembly has both the incentive to protect its prerogatives and the institutional mechanisms to do so. This case involves an impermissible judicial foray into the province of the legislature and raises a

political question that is not justiciable and which we ought not to answer. The complaint should be dismissed.

_____

1851 Center for Constitutional Law and Maurice A. Thompson; and Callendar Law Group, L.L.C., and Christopher B. Burch, for relators.

Michael DeWine, Attorney General, and Eric E. Murphy, Ryan L. Richardson, and Charity S. Robl, Assistant Attorneys General, for respondents.

Thomas W. Connors, urging granting of the writs for amicus curiae American Policy Roundtable, d.b.a. Ohio Roundtable.

AARP Foundation Litigation and Iris Y. Gonzalez, urging denial of the writs for amicus curiae AARP.

Ohio Poverty Law Center, L.L.C., Douglas L. Rogers, and Eugene R. King, urging denial of the writs for amici curiae American Cancer Society Cancer Action Network, Community Legal Aid Services, Inc., Franklin County Public Defender, Legal Aid of Western Ohio, Legal Aid Society of Cleveland, Legal Aid Society of Columbus, Legal Aid Society of Southwest Ohio, L.L.C., National Association of Social Workers-Ohio, National Health Law Program, National Multiple Sclerosis Society Ohio Chapters, Ohio Association of Area Agencies on Aging, Ohio Federation of Teachers, Ohio Olmstead Task Force, Ohio Poverty Law Center, L.L.C., Ohio Voices for Children, Policy Matters Ohio, Southeastern Ohio Legal Services, Center for Community Solutions, Coalition on Homelessness and Housing in Ohio, Toledo Area Jobs with Justice & Interfaith Worker Justice Coalition, and Universal Health Care Action Network of Ohio.

Vorys, Sater, Seymour & Pease, L.L.P., G. Ross Bridgman, Sylvia A. Brown, and Suzanne J. Scrutton, urging denial of the writs for amici curiae Advocates for Ohio's Future, Coalition for Healthy Communities, National Alliance on Mental Health, Ohio Association of County Behavioral Health

Authorities, Ohio Council of Behavioral Health and Family Services Providers, and Ohio Provider Resource Association.

Carpenter Lipps & Leland, L.L.P., Jeffrey A. Lipps, Jonathan A. Allison, and Joel E. Sechler, urging denial of the writs for amici curiae Ohio National Guard Association, Clark County Sheriff Gene A. Kelly, Cincinnati Regional Chamber of Commerce, Columbus Chamber of Commerce, Philanthropy Ohio, Dayton Chamber of Commerce, Ohio Association of Community Health Centers, Ohio Association of Health Plans, Ohio Manufacturers Association, and Ohio Right to Life Society.

Bricker & Eckler, L.L.P., Michael K. Gire, Anna Marie Sferra, Michael L. Corey, and James J. Hughes; and Sean McGlone, urging denial of the writs for amici curiae Ohio Hospital Association, Ohio Osteopathic Association, and Ohio State Medical Association.

Disability Rights Ohio, Ohio Disability Rights Law and Policy Center, Inc., and Kerstin Sjoberg-Witt, urging denial of the writs for amici curiae Disability Rights Ohio, People First of Ohio, ARC of Ohio, and Ohio Empowerment Coalition.

Eric H. Kearney and Bethany E. Sanders, urging denial of the writs for amici curiae Members of the Ohio Senate Democratic Caucus.

Advocates for Basic Legal Equality, Inc., and W. David Koeninger, urging denial of the writs for amici curiae Advocates for Basic Legal Equality, Inc., and Toledo/Lucas County CareNet.

————————————————