Pfeifer, J.,
dissenting.
{¶ 37} With today’s decision, this court for the third time has refused to determine the constitutionality of the JobsOhio legislation. In ProgressOhio.org, Inc. v. Kasich, 129 Ohio St.3d 449, 2011-Ohio-4101, 953 N.E.2d 329, this court *529 said, “Not here,” finding unconstitutional the provision in the original JobsOhio bill that required cases regarding the constitutionality of the legislation to be brought exclusively in this court. In State ex rel. JobsOhio v. Goodman, 133 Ohio St.3d 297, 2012-Ohio-4425, 978 N.E.2d 153, this court said, “Not now,” holding that the mandamus case brought by JobsOhio against Ohio Department of Commerce Director David Goodman was actually a declaratory-judgment action that should be brought first in the court of common pleas. Today, this court ends all doubt about when it will determine the constitutionality of the JobsOhio legislation, essentially responding, “Not ever.” Not here. Not now. Not ever.
{¶ 38} An Ohio citizen who possesses no personal stake in the outcome of a case other than ensuring that his or her government live up to the Ohio Constitution has a means to vindicate that cause: “This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties.” State ex rel. Ohio Academy of Trial Lawyers v. Sheward, 86 Ohio St.3d 451, 471, 715 N.E.2d 1062 (1999).
{¶ 39} The majority reluctantly accepts the concept of public-right standing, but tries to find a way to nullify it in this case. First, the majority claims that the public-right doctrine applies only to actions in mandamus and or prohibition. This is based upon the partial quotation of a statement in Sheward: “Where the object of an action in mandamus and/or prohibition is to procure the enforcement of a public right, the relator need not show any legal or special individual interest in the result * * *.” Majority opinion at ¶ 10. However, the full quote reads:
Where the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result, it being sufficient that the relator is an Ohio citizen and, as such, interested in the execution of the laws of this state.
Sheward, paragraph one of the syllabus.
{¶ 40} That statement from Sheward is about standing in general, and in no way limits public-right standing to mandamus or prohibition actions. The object of the action is the essential element of public-right standing, not the type of suit used to bring the action.
{¶ 41} Further, as the court of appeals in this case pointed out, it is the nature of this court’s jurisdiction that results in this court finding public-right standing in original actions rather than in declaratory-judgment actions:
*530 Since the Supreme Court of Ohio does not have original jurisdiction over actions for declaratory judgment, the only situations in which the Supreme Court of Ohio will initially find public-right standing will be original actions in mandamus or prohibition challenging the constitutionality of a statute. This is not the same as a rule permitting public-right standing only in original actions.
2012-Ohio-2655, 973 N.E.2d 307, ¶ 16 (10th Dist.).
{¶ 42} The majority engages in circular reasoning when it states that Article IV, Section 4(B) of the Ohio Constitution prevents appellants from asserting their claims in common pleas court. Article IV, Section 4(B) states:
The courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers 'and agencies as may be provided by law.
{¶ 43} The majority argues that a cause is justiciable only if the plaintiff has standing, and that if a common pleas court proceeds in an action where the plaintiff lacks standing, that court violates the justiciability requirement of the Ohio Constitution. But the appellants here do not lack standing — they have public-right standing. Their cause is therefore justiciable. “[T]he public action is fully conceived in Ohio as a means to vindicate the general public interest.” Sheward, 86 Ohio St.3d at 473, 715 N.E.2d 1062.
{¶ 44} Finally, the majority characterizes the JobsOhio legislation as not rising to the level of importance that a public-right case requires. This court’s own docket suggests otherwise. The General Assembly thought that a resolution of the constitutionality of the JobsOhio legislation was important enough to create, through Section 3 of 2011 Am.Sub.H.B. No. 1 (“H.B. 1”), “exclusive, original jurisdiction” in this court to quickly deal with constitutional claims brought against the legislation — it installed a 60-day statute of limitations running from the effective date of the act. In ProgressOhio.org, this court declared Section 3 of H.B. 1 unconstitutional. 129 Ohio St.3d 449, 2011-Ohio-4101, 953 N.E.2d 329, ¶ 5. However, during the pendency of ProgressOhio.org, the General Assembly passed 2011 Am.Sub.H.B. No. 153 (“H.B. 153”), which put in place another method for contesting the constitutionality of JobsOhio: in the common pleas court of Franklin County, with a statute of limitations for bringing claims within 90 days after the effective date of the statute. R.C. 187.09(B). In Progress-Ohio.org, this court helpfully instructed the petitioners — the same petitioners as in this case — that the provisions of H.B. 153 “provide a remedy for petitioners to *531 institute an action challenging the constitutionality of amended R.C. 187.01 et seq. by way of an action in the Franklin County Court of Common Pleas.” 129 Ohio St.3d 449, 2011-Ohio-4101, 953 N.E.2d 329, ¶ 6. Today, we see how well that advice worked out.
{¶ 45} In August 2012, JobsOhio itself was here seeking relief in mandamus. It requested that this court rule on constitutional questions regarding the legitimacy of the JobsOhio legislation, H.B. 1 and 153. Director Goodman of the Department of Commerce refused to execute the franchise-and-transfer agreement necessary to grant JobsOhio a franchise on the state’s liquor business, claiming that he could not execute the agreement until this court addressed the merits of constitutional claims against the legislation. JobsOhio, 133 Ohio St.3d 297, 2012-Ohio-4425, 978 N.E.2d 153, ¶ 9. JobsOhio’s complaint in mandamus sought a writ that would find the JobsOhio legislation constitutional and order Goodman to exercise the franchise-and-transfer agreement. Id., ¶ 10. The complaint focused on seven constitutional concerns:
(1) Whether the JobsOhio Act violates Article XIII, Section 1, which forbids the General Assembly from conferring corporate powers via special act;
(2) Whether the JobsOhio Act violates Article XIII, Section 2, which requires all corporations to be formed under the general laws;
(3) Whether the JobsOhio Act violates Article I, Section 16, which requires the courts to be open so injured parties may obtain a remedy by due process;
(4) Whether the Legislation authorizes the State to lend credit to a private corporation, in violation of Article VIII, Section 4;
(5) Whether the Transfer Act would require legislative appropriations extending past a biennium, in violation of Article II, Section 22;
(6) Whether the Transfer Act would result in the State’s issuing debt in excess of limits provided in Article VIII; and
(7) Whether Am. Sub. H.B. 153 violates the “one-subject rule” of Article II, Section 15.
Complaint at ¶ 44, JobsOhio, case No. 2012-1356, available at http://www.sconet. state.oh.us/pdf_viewer/pdf_viewer.aspx?pdf=712126.pdf.
{¶ 46} But this court held that the true object of the claim brought by JobsOhio was a declaratory judgment that this court lacked the jurisdiction to grant. JobsOhio, ¶ 14. Further, this court held that JobsOhio had “an adequate *532 remedy by way of a declaratory-judgment action in common pleas court to raise its claim that H.B. 1 and 153 are constitutional.” Id., ¶ 15.
{¶ 47} It is clear that both the governor and the General Assembly were fully aware that the JobsOhio legislation might exceed the boundaries of what is constitutionally permissible or that the threat of a finding of unconstitutionality could taint the program. They sought, through legislation and through lawsuit, our timely review so that any infirmities could be corrected either legislatively or, if necessary, by way of constitutional amendment. That we failed to act timely does not mean that review is no longer important. It simply means that if we now find the legislative scheme unconstitutional, a fix becomes messy.
{¶ 48} We should be mindful of history when considering whether “the issues sought to be litigated in this case are of such a high order of public concern as to justify allowing this action as a public action.” Sheward, 86 Ohio St.3d at 474, 715 N.E.2d 1062. Many of the claims brought by appellants involve Articles VIII and XIII of the Ohio Constitution. Those provisions were enacted in response to the issues that generated the call for a constitutional convention in 1850-1851, the convention that created the Constitution of 1851, which is the bedrock of Ohio law; it has been amended but remains our foundational document. In C.I.V.I.C. Group v. Warren, 88 Ohio St.3d 37, 39-40, 723 N.E.2d 106 (2000), this court explained some of the history behind Article VIII, Section 4:
“Since the state’s own resources were limited (at least at first), the legislature relied heavily on private enterprise to build and operate roads, bridges, ferries, canals and railroads. Most of the canal system was financed directly by the state, resulting in debts of $16 million. In the 1830’s the state and local governments shifted to a policy of financing turnpike, canal and railroad companies by lending credit or purchasing stock. Insofar as an effective transportation network sprang into being in a remarkably short time, these practices had the desired result. But, they also had undesirable results: they put the state’s money and credit at risk in business schemes that often were risky at best, and the demonstrated willingness of the legislature and local bodies to use them was an open invitation for private interests to dip into the public till. Many of these companies failed, the public debt burgeoned as a consequence, and by 1850 the burden was more than the taxpayers could tolerate. This section was adopted to put a halt to these practices.” [Editorial Comment to Section 4, Article VIII] Baldwin’s Ohio Revised Code Annotated (1993) 202.
The climate of the times was agitation and anger over the imposition of tax burdens on the citizens for the benefit of private corporations and for the public losses incurred when subsidized corporations failed. Gold *533 [Public Aid to Private Enterprises under the Ohio Constitution: Section 4, 6, and 13 of Article VIII in Historical Perspective ], 16 Toledo Law Review [405] at 411 [(1985)].
{¶ 49} Ohio was part of a national trend: “Between 1842 and 1852, eleven states adopted new constitutions, simultaneously creating procedures for issuing government debt and for chartering corporations through general incorporation acts.” Wallis, Constitutions, Corporations and Corruption: American States and Constitutional Change, 1842 to 1852, 65 J.Econ.Hist. 211 (2005). These states were emerging from crises of public debt and corruption. This emergence in Ohio has been described as follows:
It was the period when the people awakened to consciousness of the state and that the state was a unit of the individuals. This consciousness came about largely as the result of the mad rush to rob the state treasury and heap up debts to be paid by generations yet unborn.
Finally, the demand for relief grew so strong that, in 1849, the legislature was compelled to allow people to vote on the question of making a new Constitution. It carried, and the convention met.
Isaac Franklin Patterson, The Constitutions of Ohio, 18-19 (1912).
{¶ 50} The issues appellants raise concern the structure of government rather than individual rights. The fact that those issues do not lead to an injury to an individual should not prevent this court from ensuring that the principles and requirements of those constitutional provisions are maintained. By doing so, we implicitly recognize the standing of our founders. This court bears a responsibility to today’s citizens and to the framers to answer the questions appellants pose.
{¶ 51} This case presents issues easily as important as those involved in the Medicaid expansion case, State ex rel. Cleveland Right to Life v. State of Ohio Controlling Bd., 138 Ohio St.3d 57, 2013-Ohio-5632, 3 N.E.3d 185, where this court dealt with the question “Did the Ohio Controlling Board violate R.C. 127.17 by approving the Ohio Department of Medicaid’s request for increased appropriation authority for the Hospital Care Assurance Match Fund?” Id., ¶ 4. This court answered that question without even addressing the respondents’ argument that the relators lacked standing.
{¶ 52} Today, this court ensures that no court will ever address the question of the constitutionality of the JobsOhio legislation. Neither the state, nor its counsel, nor the majority opinion has been able to conjure a realistic example of a *534 person or entity that would have the requisite standing and inclination to bring a claim. Ohioans will never know whether their government is violating the constitution. Apparently, they do not deserve to know.
{¶ 53} It is understandable that once the bonds have been sold and the program is up and running, neither the governor nor the legislature wishes to have our review. We, however, should not compound past errors in judgment by making another momentous error and limiting Ohio citizens’ access to our court to question the constitutionality of legislation establishing the state’s direct involvement into the finances of private corporations. It is a limitation that will live far beyond this present controversy. This decision will be the lodestar opinion offered as the reason to block judicial review of constitutionally questionable legislation for decades to come.
{¶ 54} Across our state, in every county, there is a courthouse; many of them are historic buildings that sit in the center of town and are the center of civic life. In those courthouses are dedicated staff and judges who have sworn to “administer justice without respect to persons,” R.C. 3.23; there, no lobbyists, no connections, no special relationships are necessary before a citizen can be heard. Today, we slam the doors on all those courthouses, denying Ohioans the opportunity to discover whether their government has been true to the Constitution.
{¶ 55} On the north side of this court’s own building, in the reflecting pool, granite words have been installed by the artist Malcolm Cochran in a piece called “In Principle and In Practice.” The words are Reason, Honor, Wisdom, Compassion, Justice, Truth, Equity, Peace, Integrity, and Honesty. Mr. Cochran would have been more accurate using just six of those letters: “We Pass.”
O’Neill, J., concurs in the foregoing opinion.